NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

JOANNE CULLEY,                              :
                                            :
                    Plaintiff,              :          Civil No. 05-2279 (AET)
                                            :
        v.                                  :          **MEMORANDUM AND ORDER**
                                            :
LIBERTY LIFE ASSURANCE                      :
COMPANY OF BOSTON,                          :
                                            :
                    Defendant.              :
_____            :

THOMPSON, U.S.D.J.

### INTRODUCTION

        This matter comes before the Court on behalf of Defendant Liberty Life Assurance

Company of Boston's Motion for Summary Judgment and Plaintiff Joanne Culley's Cross

Motion for Summary Judgment.  The Court has decided this motion based upon the submissions

of the parties, without oral argument, pursuant to Fed. R. Civ. P. 78.  For the reasons stated

below, Plaintiff's motion is granted, and Defendant's motion is denied.

### BACKGROUND

        This is a dispute concerning ERISA benefits.  Plaintiff Joanne Culley was a supervisor for

John Wiley & Sons Inc. ("John Wiley") for over a decade.  In early 2001, she injured herself

mopping the floors of her home.  (Heins Decl. Ex. B, B-07.)  On August 8, 2002, Plaintiff left

work because her back pain had worsened, and on August 9, 2002, she applied for Short Term

Disability benefits ("STD benefits") from Defendant, which is John Wiley's benefits provider.

1

(Id. at B-05.)  Under Defendant's ERISA plan, set forth within the Group Disability Income Policy (the "Policy"), Liberty acts as both the insurer and claims administrator, and is vested with the authority, in its sole discretion, to construe the terms and determine an applicant's benefit eligibility.  (Heins Decl. Ex. A, A-44.)  On August 19, 2002, Defendant approved Plaintiff's request for STD benefits, due to her reports of "extreme low back pain/degenerative lumbar spine x-ray and bone scan."  (B-4-5.)  Plaintiff's STD benefits were extended based upon a report by her treating physician, Dr. Stephen Schneider, on October 10, 2002 (Heins Decl. Ex. C, C-28), which recommended Plaintiff abstain from performing work-related activity because she had "a compression fracture [at] T11 and T12,[1] osteoporosis, back pain and radiculopathy."  (Id.)  He elaborated that there existed an "abnormality present within the L2 vertebral body" which was later determined to be negative.  (Id.)  Dr. Schneider also diagnosed the existence of an "[a]nterior wedge compression deformity . . . involving the T11 and T12 vertebra with kyphotic angulation at the thoracic junction . . . ."  (C-30.)  Dr. Schneider attached an MRI report dated September 10, 2002 as a basis for his diagnosis.  Lastly, Dr. Scheider remarked that Plaintiff suffered a "degenerative loss of disc height in the lower thoracic region."  (Id.).  Dr. Schneider estimated that Plaintiff could return to work in approximately six weeks. (C-28.)

On December 12, 2002, just prior to the expiration of Plaintiff's STD benefits, Defendant evaluated Plaintiff's case file for whether approval of Long Term Disability ("LTD") benefits was warranted.  Defendants investigated the physical requirements of Plaintiff's job,

---

[1]The spinal column is comprised of vertebrae, which are categorized in four regions, the cervical– the neck, the thoracic– the mid-back, the lumbar– the low back, and the sacral– the tail bone.  Individual vertebra are numbered, and abbreviated by region, thus T11 and T12, stand for the eleventh and twelfth vertebra from the top, which are situated in the thoracic region.

interviewing Plaintiff, her supervisor at John Wiley, and consulting their in-house vocational case manager ("VCM").  Based upon the interviews, and the VCM's consultation with the United States Department of Labor's ("USDOL") listing for matching job descriptions under the heading "Supervisor," Defendant determined the physical demands of Plaintiff's job fell into the "sedentary" category.[2]  Defendant also investigated Plaintiff's physical condition and had Plaintiff fill out an activity questionnaire. (C-53-55.)  Therein she stated she could sit for one hour, stand for thirty minutes, and walk for twenty minutes, but noted that she "walk[s], stand[s], sit[s], [and] lie[s] down, predicated on the pain in [her] back.  (Id.)  She further stated that she cannot exercise due to her pain, which also causes her to lose concentration.  She stated that she tries to cook, and wash her clothes, and tend to her appearance, however she stated that she "can't do much in constant pain."  (C-55.)

On December 5, 2002, Dr. Schneider supplemented his earlier report, indicating that Plaintiff suffered from a "thoracic compression" (C-63) and "spinal stenosis" (Id.).  He further stated that Plaintiff had "severe compression [of the] thoracic spine" (C-64) and estimated that she could return to work in March  2003, stating that Plaintiff "is still in a great deal of pain . . ." and "[h]opefully . . . she will be able to get back to work in the near future."  (C-68.)   Based on this information, Defendant approved Plaintiff's LTD on January 22, 2003.  (C-79-80.)  Defendant's claim records indicate that Defendant approved Plaintiff's LTD benefits based on

---

[2]Plaintiff disputes the characterization of her job as sedentary.  Defendant used a USDOL survey from the 1970s for the classification, and Defendant's VCM recommended that Defendant "consider a referral for a complete [VCM] file review to determine if further investigation, including, but not limited to, a Labor Market Survey is needed" to properly classify Plaintiff's job.  (C-45.)  Thus, Plaintiff argues that the characterization is invalid.  Because the characterization of Plaintiff's job as sedentary is not vital to the disposition of the cross motions for summary judgment, the Court need not further address the issue.

her "compressed [fractures] of the thoracic spine."  (B-10-11.)

On February 15, 2003, Plaintiff began seeing Dr. Susan M. Slater for physical therapy, who provided records of their sessions to Defendant.  (C-84-90.)  Dr. Slater stated that Plaintiff could not sit from longer than 15-20 minutes, that she could only walk or kneel for five minutes, and that Plaintiff should not stand at all. (Id.)  Dr. Slater's diagnosis reiterated Dr. Schneider's, stating Plaintiff had compression fractures at the T11 and T12 juncture, and had degenerative changes of the thoracic and lumbar spine.  (Id.)

Sometime thereafter, Dr. Schneider referred Plaintiff to Dr. Sharon C. Worosilo for pain management.  In a letter from Dr. Worosilo to Dr. Schneider, dated April 29, 2003, she noted that Plaintiff's symptoms had spread from Plaintiff's lumbar and thoracic region of the spine to include Plaintiff's cervical vertebrae as well.  (C-101-102.)  Dr. Worosilo listed Plaintiff's pain as being a 9 on a scale of 1-10, with 10 being the most severe.  Further, Dr. Worosilo noted Plaintiff reported "trouble falling asleep [with frequent] night-time awakings [sic] due to pain." (Id.)

Dr. Worosilo's examination of Plaintiff revealed she had a "decrease[d] range-of-motion about the cervical spine in all planes. . ." (C-103.)  Plaintiff's spine also showed some mild tenderness to "palpataion" over the T12/L1 juncture, as well as decreased range of motion, low back pain, post-compression fractures of the thoracic region, and suspected herniated nucleus pulposus of the cervical and lumbar spine, with radicular pain.  (Id.)  Dr. Worosilo had Plaintiff undergo another MRI of her cervical and lumbar spine, on May 5, 2003, which revealed disc dessication, and facet joint changes at the L5-S1 and L4-L5 levels.  (C-115.)  Further, the MRI showed numerous problems with Plaintiff's cervical spine.  Because previously prescribed pain

medication was unsuccessful in alleviating Plaintiff's pain, Dr. Worosilo prescribed epidural

steroid injections to Plaintiff's lumbar and cervical regions on June 6, 2003.  (C-115-116.)

On July 22, 2003, Dr. Worosilo reported to Defendant that Plaintiff had responded very

well to the epidural injections of her neck, and that Plaintiff now "only occasionally gets the pain

extending from her cervical spine . . . ."  (C-135.)  However, Dr. Worosilo also noted that

Plaintiff "still continues to have unremitting pain emanating from her lumbar spine with

extension to her lower extremities . . . ."  (Id.)  Based on those results, Dr. Worosilo continued

with the neck injections but discontinued the lumbar injections because of the unlikelihood of

their efficacy.

On August 14, 2003, after receiving these supplemental reports on Plaintiff's progress,

Defendant referred Plaintiff's file for review to Dr. Anthony Parisi, an orthopedic specialist,

hired by Defendant as a consulting physician who reviews claims.  Together with the referral,

Defendant asked Dr. Parisi several questions:

> 1. Based on the results of the LUMBAR MRI, are any restrictions/limitations
> supported? Please define.  2. As [claimant] underwent CERVICAL spine
> [epidural injections with] abatement of her symptoms, are any
> restrictions/limitations supported related to her CERVICAL SPINE? If so,
> please define . . . (C-152.)

On August 19, 2003, Dr. Parisi issued his report (C-154-156), stating the May 5,

2003 MRI confirmed Dr. Worosilo's diagnosis and showed "moderate cervical

spondylosis" and "degenerative disease of her spine."  (Id.)  Dr. Parisis also noted that

Plaintiff's problems "apparently started [with] compression fractures of the lower

thoracic spine, but the details of this condition are not found in the file."  (C-154.)  Based

upon the records that Dr. Parisi did have, he concluded Plaintiff's impairments supported

5

only "mild restrictions and limitations" on her ability to work.  (C-155.)  However, Dr.

Parisi also noted that "if a more specific evaluation of [Plaintiff's] functioning is needed,

a period of activity observations could be considered" as he concluded "the exact level of

her functionality is unclear."  (Id.)

On August 29, 2003, Defendants canceled Plaintiff's LTD benefits based on Dr.

Parisi's report, informing Plaintiff by letter that she was no longer disabled.  (C-161-163.)

After receiving an extension to submit additional evidence, Plaintiff timely appealed

Defendant's decision on December 17, 2003, and supplemented her prior medical records

with a notice that Plaintiff had been approved to receive social security insurance

benefits, a report from Dr. Mark Friedman, and some additional medical records.  On

November 13, 2003, Dr. Friedman reviewed Plaintiff's medical records and performed a

physical examination and remarked that Plaintiff had great difficulty straightening her

back out, that she was very unsteady, and had an "antalgic gait with pain in the thoracic

and lumbar area on movement."  (C-177.)  Dr. Friedman concluded that Plaintiff  "is

unable to work because she cannot lift due to pain in her neck and upper back, numbness

of the hands . . . She also has difficulty in standing and walking because of the kyphosis,

post fracture pain and the lumbar radiculopathy."  (C-178.)  Dr. Friedman concluded that

Plaintiff has "a permanent condition with prognosis poor for recovery.  This lady is

permanently disabled."  (Id.)

On January 15, 2004, Defendant submitted Plaintiff's appeal to Dr. Thomas

Muzzonigro, an orthopedic surgeon, to assess Plaintiff's claim.   After a brief review of

Plaintiff's medical records Dr. Muzzonigro concluded that Plaintiff "would fall within the

sedentary physical demand" and that she would "not be precluded from sedentary work."

(C-237.)  He concluded based on the information before him that Plaintiff was capable of

performing the "activities of daily living" and could perform sedentary activities "without

restriction."  (Id.)  On February 6, 2004, Defendant sent Plaintiff final notice of the

termination of her benefits.  (C-243.)  Plaintiff and Defendant's cross motions for

summary judgment followed.

<u>DISCUSSION</u>

<u>A</u>.      <u>Standard for Summary Judgment</u>

A party seeking summary judgment must "show that there is no genuine issue as

to any material fact and the moving party is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Orson, Inc. v. Miramax

Film Corp.</u>, 79 F.3d 1358, 1366 (3d Cir. 1996).  The moving party bears the initial burden

of showing the absence of a genuine issue of material fact.  <u>Celotex</u>, 477 U.S. at 323;

<u>Padillas v. Stork-Gamco, Inc.</u>, 186 F.3d 412, 414 (3d Cir. 1999).  The moving party may

cite to the pleadings, deposition, answers to interrogatories, and admissions on file, to

demonstrate that no genuine issue of material fact exists and that the party is entitled to

judgment as a matter of law.  <u>Lawyers Title Ins. Corp. v. Philips Title Agency</u>, 361 F.

Supp. 2d 443, 446 (D.N.J. 2005).  "When the moving party has pointed to material facts

tending to show there is no genuine issue for trial, the 'opponent must do more than

simply show that there is some metaphysical doubt as to the material facts.'" <u>Rossi v.

Standard Roofing, Inc.</u>, 156 F.3d 452, 466 n.9 (3d Cir. 1998) (quoting <u>Matsushita Elec.

Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986)).  If, however, the

nonmoving party fails to offer evidence exceeding a "mere scintilla" threshold, then the

Court shall grant summary judgment in favor of the movant.  See, e.g., Citibank, N.A . v.

Hicks, No. Civ.A. 03-2283, 2004 WL 945142, at *6 (E.D. Pa. Apr. 29, 2004).  On

October 13, 2006, a Court Order [20] allowed Plaintiff to submit an amended report.

This ruling was anchored in Third Circuit precedent, which requires "district courts to

consider the nature and degree of apparent conflicts [of ERISA administrative decision-

makers] with a view to shaping [the courts'] arbitrary and capricious review of the

benefits determinations of discretionary decision-makers." Pinto v. Reliance Std. Ins.

Co., 214 F.3d 377, 393 (3d. Cir. 2000).

B.     Standard of Review of Defendant's ERISA Decision

        The Court previously determined that because Defendant's Policy makes clear

that Defendant is both the administrator and the funder for LTD claims,[3] under Pinto, this

is the paradigmatic instance for when a district court should review an insurer's LTD

decisions under the heightened arbitrary and capricious standard.  Pinto v. Reliance

Standard Life Ins. Co., 214 F.3d 377, 387 (3d Cir. 2000).  The heightened arbitrary and

capricious standard is a sliding scale, which courts may rachet up depending upon the

level of conflict and bias demonstrated within the record.  Id. at 392 (stating "the degree

---

        [3]See Def.'s Mot. to Bar Pl.'s Amended Expert Report Ex. A, which states "Liberty agrees
to pay the benefits provided by this policy in accordance with its provisions." The Group Policy
further states "[w]hen Liberty receives Proof that a Covered Person is Disabled . . . Liberty will
pay the Covered Person a Monthly Benefit . . . " (Id. at D-00025.)  The Group Policy further
states that  "[p]roof [of disability] must be given upon Liberty's request . . ."  (Id.)  These
provisions make clear that Defendant is indeed both the administrator and funder, as Defendants
may demand "proof," and then when satisfied that the claimant is disabled Defendant will pay
the disability benefits.

of scrutiny [intensifies] to match the degree of conflict").  Here, Plaintiff argues that the

Court should apply the highest level of scrutiny to Defendant's LTD denial, as she asserts

Defendant engaged in numerous procedural irregularities and showed a great deal of bias.

Defendant in turn argues that the lowest level of "heightened" scrutiny should be applied

as the conflict merely arises out of the organizational structure of Defendant, both funding

and administrating the LTD benefits, and nothing else.

       The Court will apply an elevated heightened arbitrary and capricious standard of

review, as Plaintiff has demonstrated several procedural irregularities.  Several times

throughout the record, Defendant ignored recommendations regarding the evaluation of

Plaintiff's case.  First, Defendant classified Plaintiff's job activity level as sedentary

based upon a USDOL listing from the 1970s.  Defendant labeled Plaintiff's job as such,

despite a recommendation from its VCM stating Defendant should "consider a referral for

a complete [VCM] file review to determine if further investigation, including, but not

limited to, a Labor Market Survey is needed" to properly classify Plaintiff's job.  (C-45).

Defendant also ignored a recommendation by Dr. Parisi, who stated that although he

believed Plaintiff's ailments only caused "mild restrictions," he concluded "the exact

level of her functionality is unclear" and he recommended "a period of activity

observations" "if a more specific evaluation of [Plaintiff's] functioning is needed."  (C-

155.)  Finally, after Plaintiff appealed Defendant's denial of her LTD, and submitted

supplemental medical information, Defendant's Nurse Case Manager ("NCM")

recommended Defendant conduct another consulting physician review, and another peer

review involving Dr. Schneider, Plaintiff's treating physician.  Defendant chose not to

follow that recommendation as well.

Further, it appears from the record that when Defendant submitted Plaintiff's case file to its reviewing physicians Dr. Parisi and Dr. Muzzonigro, Plaintiff's entire medical file was either not included or not reviewed.  Dr. Parisi stated that he had no information regarding Plaintiff's thoracic compression fractures, which were documented in a September 30, 2002 MRI report. (C-30 (MRI report of Plaintiff's thoracic and lumbar spine dated September 30, 2002)); (C-154 (Dr. Parisi's report acknowledges a reference to Plaintiff's thoracic compression fractures but notes "the details of this condition are not found in the file".))  Further, Dr. Muzzonigro listed the records provided for his review and it is clear that a large portion of Plaintiff's medical file was not included on the list.

Defendant cites case law which states that they are not required to follow every recommendation of its employees.  (Reichert v. Liberty Life Assurance Co. of Boston, No. 05-2518, 2007 WL 433321, at *7 (D.N.J. Feb. 5, 2007).  While Defendant may not be required to follow every recommendation of its employees, Pinto informs that when an insurance company makes decisions that disfavor the claimant at each "crossroads" that arise, this constitutes a reason to elevate the court's scrutiny of the decision.  Pinto, 214 F.3d at 394.  Such is the case here.  Further, although Defendant disputes that its reviewing physicians were not provided with Plaintiff's entire medical file, the admissions within the record make clear that several records were either not provided to or not reviewed by Dr. Parisi and Dr. Muzzonigro.  Thus, the Court shall apply an elevated heightened arbitrary and capricious review of Defendant's claim decision.

10

C.    Defendants Termination of Plaintiff's LTD Was Arbitrary and Capricious

       Defendant concedes that it "does not reject the medical diagnoses" reported by

Plaintiff's treating physicians.  (Def.'s Statement of Material Facts, ¶84).  Rather,

Defendant based its denial of Plaintiff's LTD benefits upon the reports of its reviewing

physicians, which found that she could perform sedentary work and that she was only

mildly restricted.  Taking the reports in turn, Dr. Parisi's findings were insufficient to

support a determination that Plaintiff was only "mildly restricted" and could perform

sedentary work.  Dr. Parisi did not have information pertaining to Plaintiff's thoracic

spine injury, which was the initial reason that Defendant granted Plaintiff's LTD benefits.

Dr. Parisi determined that Plaintiff was only mildly restricted because her cervical spinal

pain responded well to epidural injections.  (C-155.)  However, the cervical injury arose

after the approval of Plaintiff's LTD benefits which were based upon the injuries to her

lumbar and thoracic spine,  which, according to Plaintiff's treating physicians, continued

to cause her "unremitting pain." (C-135.)  Further, Dr. Muzzonigro's decision was

arbitrary and capricious because he found that Plaintiff could perform her daily household

tasks, and thus was capable of performing the work required for a sedentary occupation.

However, the record is wholly without support that Plaintiff could perform her daily

household tasks.  None of Plaintiff's treating physicians stated that Plaintiff could sit or

stand for longer than an hour.  Further, according to Plaintiff's surveys, although she

stated that she could sit for one hour, stand for thirty minutes, and walk for twenty

minutes, she also noted that her ability to "walk, stand, sit, [and] lie down, predicated on

the pain in [her] back.  (C-54.)  Although she did state that she tries to cook, wash her

clothes, and tend to her appearance, Plaintiff also stated that she "can't do much in constant pain."  (C-55.)

Dr. Muzzinigro's nine-sentence conclusory opinion,  failed to take into account the contradictory opinions of Dr. Friedman, Dr. Schneider, Dr. Slater, and Dr. Worosilo, which found that Plaintiff suffered unremitting pain and was permanently disabled.  As other courts have noted, an insurer may not "adopt a consultant's opinion in the face of overwhelming evidence to the contrary without some explanation for doing so." Stith, 356 F.Supp. 2d at 340.

Here, Plaintiff's LTD benefits were approved based upon her compression fractures of the thoracic spine.  Her spine deteriorated and her cervical spine and lumbar spine were found to be damaged.  Plaintiff's cervical spine responded well to treatment, however, her lumbar spine continued to cause her a great deal of pain.  Defendant then terminated her benefits, without any evidence in the record tending to show that Plaintiff's thoracic spine pain was alleviated or that her lumbar spine condition had improved, and thus it was without credible evidence in the record to support its decision. Therefore, Plaintiff's motion for summary judgment is granted, and Defendant's motion for summary judgment is denied.

## CONCLUSION

For the reasons given above, and for good cause shown,

It is on this 21st day of September 2007,

**ORDERED** that Defendant's Motion for Summary Judgment [33] is Denied; and it is further

12

**ORDERED** that Plaintiff's Motion for Summary Judgment [34] is Granted; and it is further

**ORDERED** that Plaintiff's Long Term Disability benefits shall be reinstated.


s/ Anne E. Thompson
ANNE E. THOMPSON, U.S.D.J.